The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit, Oyez, Oyez, Oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Be seated, please. I want to welcome everyone to the Fourth Circuit Court of Appeals this morning. In particular, I want to welcome all the high school students. And we're glad to have you here and we hope that you'll learn a lot. In the first case this morning, United States v. Said, Mr. Hatch, on behalf of the government. Good morning. May it please the Court. Ben Hatch on behalf of the United States. I know the Court is already familiar with this case, having heard the interlocutory appeal previously in the case. And since that time, the case went back down. We had a trial and each of these five defendants was found guilty on each charge of engaging in a violent, radical assault on the USS Ashland. As well as engaging for three of the defendants in an earlier piracy venture where they went out and encountered a British frigate called the HMS Chatham. They were all found guilty after a trial. And then at the time of sentencing, Judge Jackson concluded that the mandatory life amendment as applied to each of these defendants. And it is that issue which the United States has appealed to this Court. And the defendants, of course, have appealed issues as well. But I'd like to start with the Eighth Amendment issue, if it pleases the Court. With regard to the Eighth Amendment issue, I would start with the point that as I understand the defendants' arguments on appeal, they do not defend the reasoning that Judge Jackson employed below. So the Court has the reasoning of Judge Jackson and I'll address that. But the Court has an alternate theory that's different from Judge Jackson's reasoning that the defendants put forward today. And both of them, I would submit to you, are not based on precedent or inconsistent with the Eighth Amendment analysis and inconsistent with our constitutional system which vests in Congress the authority to assess the appropriate punishment subject only to Eighth Amendment limits, which no Court, I would submit, has ever suggested would foreclose the penalty Congress chose here. Beginning with Judge Jackson's analysis, I believe the two most salient issues that the United States would identify with Judge Jackson's analysis is that Judge Jackson, I believe, did not credit the harm that was threatened by this conduct. He did address the general issues of piracy and the general harm and he called it a very grave offense and we certainly agree with that. But I think it was critical to Judge Jackson's opinion that they didn't actually take over the ship and that they didn't happen to shoot anybody in their assault. And so the harm, the worst of the harms that could have occurred did not occur and he gave them the benefit of that in the Eighth Amendment analysis. And as we've argued in the brief, I think whether this Court looks to the Harmelin decision or Solemn v. Helm or to its own decisions, such as the Cobbler decision, which was a very recent decision, obviously the Court looks not just at what specifically happened but what would happen based on the crime, what the defendant threatened with their conduct. If you go to Harmelin, the Court didn't just say how much harm is caused if this defendant had distributed 642 grams of cocaine. And we'll only look at that harm. It looked at the general harm of the nature of drug dealing and it looked at the harm that was threatened not just by that defendant's possession but by the likely distribution. Well, you say we have to assume maybe this was a merchant ship that wouldn't have been able to defend itself? I think that's certainly, that's what the defendants were trying for. I don't think anybody would argue to this Court that they wanted to attack a Navy ship. That was a mistake on their part. And that what they wanted to attack was a defenseless merchant ship, exactly, Your Honor. And I would say that there was significant harm threatened to the Navy ship. The AK-47 is a notoriously imprecise weapon. And I would submit to you that shooting it from a small skiff on a bumping ocean at high speed is a very dangerous thing to do. And so there was a real harm that was threatened to those sailors. But certainly had it been a merchant ship, which likely would have been taken by their attack, taken back to Somalia, held, you know, many people on that merchant ship would have been held for months, sometimes years, under very difficult conditions. Obviously, the Court, I'm sure, is aware of some of the issues Somalia has faced and don't have. Unfortunately, our medical facilities are certainly not bestowed by the pirates when they're holding you hostage. So it's a very grave harm that's threatened. And as we put in the record, terrible things have happened to hostages during their periods being held by the pirates. And that's exactly what these defendants set out to do. And I think that when you look to the culpability, it's one thing I think everyone appreciates. How old is this mandatory life provision? The mandatory life provision was put in place in the early 20th century. The original penalty was mandatory death. And that was essentially, whether it was in 1790 when Congress passed the first piracy prohibitions, not identical to this, or 1819 when it passed the precursor to this, Congress applied mandatory death sentences to all those offenses. Did they hang people back then? Is that when they started it? Is that how they did it, or do you know? Well, I certainly, I don't know. The only case, I believe, of a piracy conviction under this offense was the Smith case, and I don't know how they disposed of that. I do know that prior to our constitutional system, they did hang the pirates involved with Blackbeard down in the Williamsburg area. So that was the method, I believe, at that time. It was in 1909 that they changed from death penalty to life in prison. That's correct, Your Honor. Mandatory life, and they applied that not just to Section 1651, but to the various offenses that had previously had the mandatory. Judge Jackson gave these fellows some pretty long sentences. He did, Your Honor. He nailed them pretty good. He gave them substantial sentences, there's no doubt. But we are here to argue for the sentence that Congress, I believe. And parole was abolished when, in 1884, with the Sentencing Reform Act? I believe that's correct, Your Honor. So for about 75 years, a life sentence for piracy meant you were eligible for parole. That sounds correct, Your Honor. But in the last 30 years, piracy meant you really did serve life, all of life. That's correct, Your Honor. And, of course, that would be true of any of the offenses that now carry mandatory life. And while that's not the most common penalty. How many other mandatory life do we have? Well, I believe there's some that it depends on the circumstances of the offense. Yeah, and there's just flat-out congressional mandate, you commit this crime, life forever. But that's not redundant. We cited several that are in Chapter 81 that are similar. Whenever they're pirates, they're mandatory. And there's probably five or so additional in Chapter 81. Other mandatory life sentences come in the Vicar violent crime and aid of racketeering if you commit murder. The ones that are most analogous to this, I would point the Court to the hostage-taking statute if death results. Is there any other one where there's no requirement that there be a death? Yes, Your Honor. What's the other federal statutes where you get mandatory life even in the absence of a death? Well, Your Honor, closest to this offense, the other Chapter 81 offenses that we cite in our brief, and I can go through them right here, but the other offenses. Other than the piracy stuff. Right. So in the drug context that comes up the most often, obviously a drug defendant who has a certain number of priors in the United States files those priors. Okay, but that's based on priors. I'm asking are there any other federal statutes where Congress has said, we don't care who you are, we don't care what you did, we don't care when you did it, we don't care what the level of culpability is, attempts, aiding and abetting, doesn't matter, you get a mandatory life without parole. Is there any other statute? Beyond the other piracy ones, none come to mind off the top of my head. Most of them are tied to recidivism or to the death resulting. But as we said in our brief, I think this is a case where there was a death that resulted, and we didn't charge that in the charging document, but as this case comes to the court, it's the Eighth Amendment analysis. And so that's why we bring that to the court's attention, is that I do think even if the court were to say, you know, is this on a magnitude of that nature, it is on a magnitude of that nature. Your objection is Judge Jackson sort of treated this as if it were a Category 43 offense under the advisory guidelines. I mean, that's essentially what you're saying. But, of course, it's a constitutional issue. I understand that. Right. I think Judge Jackson, he treated it as a significant offense. There's no doubt about that. But Congress has provided that there's a life punishment, and I think it's important that that be followed. And one of the reasons I would submit to Your Honor that perhaps they chose to treat the piracy offenses in that way, different from some of the other offenses where recidivism or whatnot is looked at, is that it typically, and particularly in this offense, this is a person that you've caught on the high seas. And our nation's history with piracy has been a history of fighting piracy on the other side of the world, primarily, since our constitutional system, Blackbeard notwithstanding. That was before. But when Jefferson sent the Navy to fight the Barbary pirates, or today, these have been events that occurred well on the other side of the world. And if you're going to have someone that you capture there, it's obviously a huge expense. You bring them back here to the United States, they face justice. And here's a person who I think, as a class, is a dangerous person in Congress's eyes. And I certainly, that's been our experience. They are attacking other ships on the high seas. But you all also, you all, the government, prosecutors, have the right to, or you reserve the right, exercise the right here to exercise your discretion. And you cut one of them a break. You made him a witness. You didn't give him the life sentence. That's correct, Your Honor. And, you know, obviously in cases where defendants have entered into plea agreements, and the court could look to Mr. Ibrahim in this case, or Mr. Musse in New York, the United States in those cases has agreed to lesser sentences. I very well understand what a significant sentence, a mandatory life sentence is. And for those defendants who came forward and accepted responsibility, they were able, we exercised our discretion and reached agreements. And he provided you some valuable information, as it turns out. It was extremely valuable. It was extremely valuable. These defendants, as is their right, elected not to accept responsibility, to go to trial on a story of being human smugglers that the jury discredited. And so, you know, they come to this court. Acceptance of responsibility to me is not as big a factor as the violence, the danger, the terrible problem of piracy. But that's another factor I think the court can look to in the Eighth Amendment analysis. They didn't treat them all the same either on the face of it. Part of them got life. Both of them got life. But one of them got out from under it. The one who was willing to accept responsibility and entered into an agreement did get a lesser deal. Those who went to trial faced the penalties that applied. And that's what we followed through on. The other thing I'd say about Judge Jackson's reasoning, we kind of covered this already, is that I believe his characterization that this penalty, that there's lesser penalties that apply to inchoate or attempted crimes versus completed crimes, is just not accurate when you look to the types of violent crimes that are most analogous to this. And we laid that out in the brief. I won't go into it unless. Can I ask you about the counts two and three, sufficiency issues? Could you just, in 30 seconds, summarize your best evidence to support the convictions for conspiracy to take hostages and conspiracy to kidnap? Yes, Your Honor. So Mr. Ibrahim was the witness, the best witness. He testified first that he'd engaged in a, it is true, he never said, I think, in his testimony that we took the people with the ship. But I think that was clearly understood by the jury. They don't, you know, they're taking a giant ship. So he said, previously I engaged in this piracy. We captured the ship called the Future and took it back and that ransom was paid for it. But how does that prove that these defendants had the specific intent to do that? Right. In this instance, on the basis of the evidence in this record. Right. So there's no allegations that those, these other defendants participated in that. But he had described, I tee that up, because he described what the piracy is that he's talking about that he'd previously done. Then he fast forwards February 2010, I'm going out with these other men, first the three of the defendants and ultimately all five of them, and our goal is to capture a ship, to make money, to capture a ship. And so then the only question is, does that include taking the people on the ship? And as I think Judge Jackson reasoned, obviously the jury can draw the reasonable inferences. And, you know, there is no way, unless they were going to dump the entire crew of a ship in the ocean, which would be counterproductive from their purposes, that they're not taking those people back with the ship. So your argument seems to be piracy as a matter of law includes taking hostages. No, Your Honor. That capturing, when he, when Mr. Ibrahim said our goal is to capture a ship to make money, which he did say several times, that that is the current, yeah, that is the common version. It does include hostage taking. That is their goal. It could include it. Right. But the Somali version, for example, there's Indonesian piracy that also occurs. And what's most common in that is they sneak onto your ship at night. What's most common in Indonesian piracy, Brazilian piracy, Somalian piracy doesn't help me in a specific case. We have a case here today in which I have to look at the evidence and determine whether the jury could rationally conclude, beyond a reasonable doubt, that these defendants had the specific intent to do what your charging document says they had the specific intent to do. In other words, this isn't like a drug conspiracy where you can charge cocaine and heroin and marijuana and ecstasy, and if you prove either one of them, you're good. Here you have specific statutory provisions, conspiracy to kidnap, conspiracy to do this, conspiracy to commit piracy. And so you seem to be, I don't mean this as a criticism, but you seem to be lumping it all together and almost treating the other two as lesser included offenses. Well, they're overlapping. There's no doubt as applied to this offense conduct because what these pirates do is take the ship and the people and take it back for ransom. And that also constitutes. The question for us is, what did they intend to do in the commission of this offense? And what evidence in the record is there that points to that intent beyond a reasonable doubt? Yes, Your Honor. The best evidence, Mr. Ibrahim testified they all shared the same plan. So he testified to that. I was restricted a bit in conspirator communications, but so then I said, did you all agree to this? He said, yes, they all agreed on each trip. I asked them, their plan was to capture a ship for money. And so the only question is, can the jury reasonably, beyond a reasonable doubt, infer from that that that meant also the people on the ship, which, you know, I'd submit the defense could have, you know, if they thought it was unclear, asked some cross on that. I don't believe they did. I think it was very clear to the jury what what their goal was in attacking, you know, a massive ship that they were trying to get. We have to look at his testimony like most favorable to the government and figure that out. That's right, Your Honor. And Mr. Ibrahim, Judge Jackson, in excluding some of our other evidence, which I think would have also gone to that point that Judge Davis is raising, said, you know, Mr. You know, one witness can be the whole case. This is the whole case. You don't need other evidence. The jury has enough to find for you based just on him. And so that's what we have, Mr. Ibrahim's testimony. And we submit it's sufficient. I see my time's more than expired. Thank you, Your Honors. Thank you very much. You deserve a couple of minutes. A few minutes. Mr. Kamens. Good to have you here, sir. Good morning. May it please the court. First, I'd like to say that we fully endorse the reasoning of the district judge in this case. The district judge made a careful and considered decision that the imposition of a mandatory life sentence on five people in a boat where one of them fires a handheld firearm without causing any damage or physical injury would violate the Eighth Amendment prohibition on cruel and unusual punishment for approximately 180 years, beginning in 1825. So you're saying the government's mischaracterizing your position on appeal? I am. If you look at our red brief from pages 39 to 55, we address the basic solemn factors that the district court evaluated, and we fully endorse his reasoning. From 1825 until 2011 or 12, this conduct would have warranted a maximum punishment of 10 years. And that's because now we have an offense called piracy, which is identical in every material respect with the offense that is prescribed at 18 U.S.C. 1659, the plunder statute. And so if you look at the jury instructions in this case, 733 of the joint appendix for count five, 735 of the joint appendix for the plunder statute, the elements are identical. An assault on another vessel on the high seas for personal gain. That's the plunder statute. That's now the piracy statute. And the question for this court, this panel, is whether this historical tradition of treating this offense, an assault on the high seas that does not result in the taking of any property or the seizure of any ship, whether the historical tradition means that now that we have defined piracy to encompass what was traditionally attempted piracy or a less severe offense, whether that applying the punishment of life imprisonment. Resulted in the death of one of your co-conspirators. The government makes much of the idea that a death. Well, it's a fact. It's a fact. It is a fact. This assault, as you call it, resulted in his death. He got blown out of the water by the United States Navy. I don't mean to diminish the fact that a man died. What we have said in our briefing and what is very clear is that the law is directly against what the government is arguing in terms of legal liability. They have argued that the defendants essentially caused the death because of their actions. It's a classic felony murder prosecution. It is absolutely not a classic felony murder. It absolutely is. The law is absolutely against that proposition. It absolutely is. Under any number of states' laws, when two guys go into a gas station to commit a robbery and the owner of the gas station shoots one of the robbers and kills him, that's felony murder. The law is absolutely against what you just said, and it's cited in a footnote in our red brief. Which law are we talking about? We're talking about the definition of felony murder that applies to the majority of states. Under which jurisdiction? Well, the majority of jurisdictions. There is one jurisdiction. I come from Maryland. Maryland. I believe we've cited, I think we cited the Maryland law, Judge Davis, which says that the murder must have occurred from the conduct of the defendants and not a non-felon. That is, if the killing occurs because of an officer or a bystander or a victim of the offense. There are cases out there that cut against you in that, but I take your point. There is a jurisdiction, and I think it's Illinois, that is the minority. Oh, there's a minority view, sure. And what LaFave Street says is that it is well settled now that if the killing has not occurred because of what a felon does, it is not felony murder. I agree that's the more enlightened view, but it is not a unanimous view. Well, without getting into all that, he got killed as a result of what your guys did. Well, the other – He, the co-conspirator, was killed, and one of your fellas was maimed, got his leg blown off. The other basis for the ascribing liability to the defendants – They argue that if death results. It's essentially the same thing. The fact is there is not a federal case in which any defendant has ever received a death results element because a killing occurred because of a law enforcement officer. There's a district court case that says this. It's United States v. Nelson, 920 F SUP 825. Research finds no case under the federal murder statute or any of the several of death – in which a federal court has permitted prosecution for a killing when a law enforcement officer pulled the trigger and a co-felon was the victim. There is no law that supports the government's argument with respect to death results. Mr. Kamens, though, Judge Jackson himself said the incident was a violent act. He said that on page 11 of his memorandum opinion, and he then said there was no physical harm. But he was analyzing this in the context of still, nevertheless, it was a violent act, was he? He was, and we don't dispute that the underlying conduct was violent. The question is, notwithstanding the fact that this was a violent attempt, when there is no physical harm to a victim, when there is no physical injury or property damage to any victim, is the sentence that ordinarily for 180 years applied to far different conduct, the actual seizure of a ship. Does that violate the Eighth Amendment when we apply it to conduct that is traditionally only applied to – Right, but I'm sorry, I didn't mean to interrupt. To another statute with a 10-year maximum. I'm wondering, though, did Judge Jackson kind of get off the track, though, on page 13 of his opinion, where he says that any inference that violence is dispositive in the Eighth Amendment proportionality analysis is undermined by the recent cases in the juvenile context. And it seems to me, and I'd like your take on this, it seems to me that he was trying to bolster his as-applied analysis by looking at these categorical cases, the cases where the Supreme Court had looked at the juveniles as a group. And that's not what you do in the as-applied analysis. So if you could please address page 13. Sure. And tell me why this wasn't a kind of a cross-switch in reasoning that led to the wrong result. Sure. The opinion that he cites, Rommel, is not a categorical case. It's a case in which a defendant received a sentence of life, but he could receive parole in 10 years for a theft offense. And what the court says is that, and the defendant argued in that case, hey, this offense wasn't violent. So a sentence of life, although he was eligible for parole in 10 or 12 years, it's disproportionate to the offense that occurred. And the court says there is no per se rule with respect to the type of conduct, whether it is a crime of violence or a crime that isn't violent. And then I think it's Justice Rehnquist who wrote the opinion. He cites a significant nonviolent offense that could have an enormous impact on the environment or the community. What he says is that there's no basis just because of that single fact to find that the sentence is disproportionate. Right. But what about his cite to Miller as well? Well, we agree that there is a categorical analysis that applies in certain contexts, and this is not one of them. We are making an as-applied challenge. Right. But did he cross over there? Well. That's what I'm wondering. In Miller, it is the first case in which the Supreme Court has applied the categorical analysis to a non-death penalty case. And so I don't think that this is the crux of Judge Jackson's opinion. I think what he is simply saying is that there are a variety of contexts where the Supreme Court has found in a non-capital case where the presence or absence of violence is not dispositive. Essentially, in the district court below, and they've moderated their tone somewhat, but essentially what the government was arguing below is that, hey, this is a violent offense. That's enough. And it's very clear because the underlying conduct was violent that the court need not go further. And I think all that Judge Jackson is saying is, look, there are cases, non-capital cases, in which the Supreme Court has said the presence or absence of violence isn't dispositive. Right. But in the as-applied context of the Supreme Court's analysis of Eighth Amendment and inference of gross disproportionality, you don't have any cases involving violence, right? Certainly not from the Supreme Court. The government makes much of the fact that we haven't presented a case where there is a life sentence that's been overturned on a defendant who engaged in a crime of violence. That's true. There aren't many cases in which a defendant has been given a life sentence for simply attempt conduct where the offense didn't result in a death. There is one case from the Fourth Circuit in which the Fourth Circuit did reverse a sentence that was where the underlying conduct was a crime of violence. It is cited in the Solemn case, in the Solemn case by the Supreme Court. And it is called Roberts v. Collins, 544 F Circuit, F Second, 168. In that case, the defendant was charged with assault with intent to murder, which had a 15-year maximum in Maryland, and he was also charged with the common law offense of assault, which had no maximum because it was a common law offense. The defendant pleaded guilty to the offense of assault, and the government dismissed at the plea hearing the more serious charge of assault with intent to murder. The judge in that case then imposed a sentence of 20 years for the assault, which was certainly permissible because the common law offense had no maximum. But the Fourth Circuit reversed and said, even though this was a common law offense that had no maximum, the gravity of this offense is measured by the corresponding legislative penalty imposed for the more serious offense of assault with intent to commit murder of 15 years. And they said it was impermissible because a 20-year sentence was grossly disproportionate given the way the legislature had punished this conduct with the statute, the more serious statute of assault with intent to commit murder. What was the year in which that case was decided? 1976, but it is cited in the Solemn case, and it is endorsed as an example of the type of case in which courts can evaluate the gravity of an offense. In that case, it was simply looking back. The courts have always looked to other statutes to measure gravity. In the 1910 case of Weems v. United States, the court was evaluating a crime under the Philippine Code, the Philippine colony. But what they did is they looked to a federal statute, and they said this federal statute with a two-year maximum penalty is very similar to this Philippine statute in which the defendant was given 12 years of hard labor. And they said this comparison demonstrates the character of this offense. And what we are suggesting is that the federal statute here that is most analogous to what the definition of piracy now is, is 18 U.S.C. 1659, the plunder statute. The elements are identical, but Congress made the punishment for plunder 10 years. And that is a very clear example of why a punishment of life for the definition of piracy, which we now understand it to be after this panel's decision, that punishment is grossly disproportionate. Essentially, they have taken the statute that is more serious, not in this case, and expanded it to encompass conduct that is less serious, what used to be considered attempted piracy. And in that circumstance, attempted piracy for this country's almost entire history has only been punished at a 10-year statutory maximum. And that's why it is very clear that a punishment of life here would be grossly disproportionate. Who wrote that Fourth Circuit case? I can't remember. I have it right here. Was it Judge Winter? It is per curiam before Chief Judge Hainsworth, Circuit Judge Winter, and there is a Chief Judge of the Court of Customs and Patent Appeals sitting by designation. The interesting thing is that's Judge Markey. Oding, is that his name? Sorry? Sorry, with a K? It's Judge Markey. The interesting thing in the dissent by Judge Markey, who is sitting by designation, is he says, look, the court is acting essentially as a legislature providing a maximum penalty for a common law offense. And so he objects because he says this is a common law offense. There is no maximum. Why can the court do this? And the reason the court did it is because it evaluated the gravity of the offense by looking to an analogous offense that the legislature had enacted. There are three quick things I'd like to say that we disagree with in the government's argument. The first is that the statute here is extraordinarily unique. I've described it as a unicorn in the Federal Criminal Code, in that it is the one statute in which the elements have evolved since Congress enacted the statute, and this is important with respect to the deference that this court should accord to the statute itself. It also relates to how this court should measure the gravity of the offense, just as in the Roberts case when it was evaluating gravity of a common law offense in comparison to a statute that the legislature had enacted. The second thing I'd like to say is the standard. The government essentially wants to truncate the analysis in this case by saying all you have to do is look at the gravity of the offense compared to the punishment, and you can make a determination based on that. The law is very clear, as this court said in Cobbler. It has reaffirmed the court's ruling in Rhodes that extensive proportionality analysis is required in any case where you are challenging a life imprisonment without parole sentence. And here, once you look at the other indicia of proportionality as described in Solemn, and Solemn says none of them is positive. If you look at the way that other crimes are punished for this type of conduct, either in federal courts or overseas, it is no question that this sentence is extraordinarily harsh. It is grossly disproportionate. The last thing I'd like to say is that life sentences are rarely imposed in federal court. That is very clear from the Sentencing Commission's recent publication on the imposition of life sentences. Life sentences in federal court for crimes like this are mostly imposed in drug cases, in racketeering cases, in kidnapping cases. In all of those cases, and the court said it surveyed all of the life sentences imposed in fiscal year 2013, in virtually all of those cases, a death was caused by the criminal conduct. Now, again, I don't dispute that someone died in this case, but what we do dispute is that that is a basis for ascribing a harsher punishment on these defendants because that was not their intent and the death did not occur at the hands of a felon. If the court looks at all of the factors under Solemn in this case, notwithstanding the fact that this involved a crime of violence, this court has found that even defendants who engage in crimes of violence can have sentences that are grossly disproportionate. The rule from Solemn is that there is no per se rule, and that in every case the court must evaluate whether the sentence imposed is grossly disproportionate to the crime that occurred. In this case, a life sentence for these defendants means that there is no possibility for rehabilitation, that there is virtually no possibility that they will ever see anyone in their family again because they were brought here from waters off of Somalia. And that is particularly egregious in this case, given that four out of the five defendants were simply sitting on a boat, not even firing a weapon. There is no evidence in the transcript that the weapon was pointed at any human being. The co-defendant or the co-conspirator says that the intent was to fire to scare the members on the boat. In this case, the district judge is in the best position to evaluate the gravity of the offense based on the facts before him. Now, I understand that the Eighth Amendment inquiry is de novo, but the facts as found- So you're not arguing that we should give discretion on anything? Well, I think that the court must evaluate his findings of fact for clear error. And so when he evaluates the facts of the crime itself, I think the court must give deference to that and then evaluate the legal question de novo. Well, I thought the facts were to determine jury verdict. We have to look at those that are most favorable to the government. Certainly for sufficiency, we would agree with that. But with respect to the- The jury found the facts, not what I thought. Well, all I'm saying with respect to the Eighth Amendment inquiry is that the court must accord due deference and only reverse for clear error on the district court's findings of fact and then evaluate the legal question de novo. If there are no other questions, I'll reserve the remainder of my time. Thank you. Thank you very much, sir. Mr. Hatch? Thank you, Your Honor. Picking up where Mr. Kamen's left off, there are no findings of fact by Judge Jackson. The jury issued its verdict. The facts are contained in the pre-sentence reports and Mr. Green's testimony, which we submitted at sentencing. He made no factual findings in connection with his analysis. It's de novo review. And I would point out, Mr. Kamen said no evidence that the weapon was pointed at a human being. I mean, there was testimony that the shots were hitting the ship on which there were many human beings. So, yeah, is there evidence that he was looking through a sniper scope and trying to hit someone? No, but he was spraying AK-47 fire down a ship. Was there any evidence of the number of rounds that were fired at the ship? Well, that evidence, you know, in any violent crime case where you've got people seeing things, some people saw some parts. Probably the best witness, Lance Corporal Curtis, who saw from the back going front, said there were two rounds of firing. He didn't count the number, but he said he essentially emptied the first clip in the gun, then loaded a second. Two groups of firing. One man shot two times, empties the first magazine, takes it out. He shot more than two times. It was firing an automatic weapon, right? Exactly. No one was counting the shots, but there was, you know, shooting as he went up the side of the ship. Yeah, did every shot hit the ship? Who knows, but there was testimony that it was hitting the ship. With respect to, you know, I don't want to mischaracterize Mr. Kamens, but I said they took a different position because Judge Jackson said substantial deference to Congress is due, but I find overcome by this, that, and the other. Mr. Kamens, on appeal, says no deference to Congress because of the nature of this offense. And that, to me, is a different position. No deference to Congress. And on that position, I submit to you there is no case that would support that. It is inconsistent with our constitutional system, this Court and this Court's ruling in Derry, that Congress knew what it was doing when it passed this lawful statute. And so they do, I submit to you, take a separate position. But whether it's separate or not, that reasoning, I think, is dangerous and wrong. And I think under the normal Eighth Amendment analysis, for the reasons I said, this is appropriate. When you talk about comparison to other statutes, and I believe that Fourth Circuit case Mr. Kamens was talking about today, I'm not sure that they talked about that in their brief, otherwise I expect I would have talked about it more in ours. I guess it was cited in Solem. So I'm a little bit limited on that case. But it clearly was a pre-Solem case, pre-Harmelin case, and so it did not have the benefit of the framework under which we're operating today, even if it was cited favorably. And it sounds like in that case the issue was there was a question about what the legislator or what the law passer would have wanted the penalty to be. And there's no doubt about that in this case. Congress has always been very clear about what penalty they want for this offense. And when you say, well, the most analogous other statute to look to is Section 1659, I would dispute that. I would suggest the most analogous offenses are the other offenses in Chapter 81 that label someone a pirate for similar types of conduct with varying elements, but similar types of conduct, and apply a life sentence. Or if you want to go outside Chapter 81, go to Section 1203, the hostage-taking statute, which does, as Judge Davis was saying, have a high degree of overlap with this version of piracy. And that, when there's death resulting, is mandatory life. When there's not death resulting, it's a maximum of life, even for conspiracies or attempts. And I make that point because, to me, the argument that Judge Jackson endorsed is that, even if, because Harmelin said that the mandatory nature of the sentencing is irrelevant for Eighth Amendment purposes. So as I understand Judge Jackson's, the consequences of his reasoning, if Congress had just said maximum of life, but any term of years below that, and a judge on these facts had decided to impose a life sentence, that that itself would violate the Eighth Amendment. And I submit that that doesn't make sense. I believe a judge could submit, impose a life sentence on these facts, given the gravity of this offense. And if you want to look at cases that are most analogous, the Deere case, which I know this Court's very familiar with, involved conduct that actually was less egregious in that it didn't result in someone's death. But that is the most similar case out there, and that resulted in life on piracy, plus 80 years on the related gun counts. And they say very little about Deere in their pleadings, because what can they say? It's the same offense conduct, by and large, and it led to life, plus 80-year penalty. With regard to felony murder, doesn't matter if there's a split. Congress can endorse the view, and the Court can look to the view, that this amounts to the level of murder for sentencing purposes. We're not talking about criminal liability for guilt. We're talking about sentencing purposes. So the split, I submit, doesn't matter. And finally, I'd just say, with regard to the juvenile cases, they were certainly in the categorical approach. That approach is not what's at issue here. These defendants engaged in an extremely violent crime. We don't just say any violence equals a life sentence. We look to the violence. And in my experience, this is one of the most violent crimes you can see, what these men were trying to do and the harm that they threatened. And so based on their conduct, as applied, I would submit that Congress's chosen penalty is fully constitutional. And I don't believe that, in my understanding, the Court can stop at the first step, but even if you look at the comparator statutes, it's appropriate. Thank you. Thank you, Mr. Hatch. Mr. Kamens? Four things I'd like to say. First, with respect to felony murder, we've cited the law on page 40 of our red brief, footnote 11. We cite the LaFave's treatise, which says, it is now generally accepted that there is no felony murder liability when one of the felons is shot and killed by the victim, a police officer, or a bystander. We've also cited a case from Virginia, a case from West Virginia, and a case from Maryland for the same proposition. You know, I'm a little surprised that you don't rely on United Nations conventions or treaties or declarations. I mean, maybe I shouldn't be, but. There hasn't been a great deal of dispute with respect to the interjurisdictional analysis about how piracy is punished. We've provided two studies, which the Conorovitch study says that the mean punishment for piracy itself is 16 years. In terms of conventions. The United Nations has never said anything, or the European Court of Human Rights. Nobody's ever said, wait a minute, piracy is awful, but mandatory life. I mean, obviously, you've given us. The Convention on the Law of the Sea is where the definition of piracy comes from. It's Article 101, and they don't say anything about punishments. And the government's perfectly right. They say punishment is not something that's addressed in the international conventions themselves. But it is relevant what the way that other countries punish piracy. And it's very clear, even the government admits on page 20 of their blue brief, they say it's very clear that many of the other countries around the world punishing piracy would never impose mandatory life for the conduct by the defendants. So it really hasn't become. Does any of them still have the death penalty? Well, I think they do. I mean, China certainly does.  But if you look at the practice of imposing punishments for piracy, it is extraordinarily unique to impose mandatory life for this conduct, an attack that doesn't result in a seizure of a ship. I would say one thing about New Zealand. The government cites that as well. New Zealand has a prescription on attempted piracy with a max of 14 years. So it's a bad example, and they've never even prosecuted one case. The second thing I'd like to say with respect to deference, there is a law review that's cited in the solemn case. It's in footnote 26, and it makes the same point that we make, which is if a broadly defined crime does not exhibit the same thing, does not exhibit the characteristics that the legislature may have taken into account when it fixed the statutory maximum, a judicial determination that the maximum would be unconstitutionally excessive for the individual defendant's crime does not conflict with legislative choice of proper punishment. That's the common sense point that we make. No legislature has decided the elements of the piracy offense applied in this case. So there should be no deference to the punishment affixed to elements that the legislature didn't determine. With respect to 1659, the elements, that's the plunder statute, the elements are identical in material respect with piracy. It's the way the jury was instructed in this case. It's on JA 753 and 755. On the high seas, an attack of another ship with intent to steal. That's plunder. That's piracy. For 180 years, that has been punished with a 10-year maximum. The last point I'd make with respect to Dyer is that Dyer is an anomaly. It is not a historical trend. What Solemn asked this court to do is evaluate how the conduct of the defendants has been punished historically. There is no other example in the history of this country in which an attempted attack has resulted in mandatory life other than Dyer. But that is not an example that Solemn would say demonstrates that the offense historically has received this punishment. That is the concern under Solemn. In closing, I'd like to say that this is a unique case that involves a statute unlike any other in the Federal Criminal Code. And so regardless of how this court decides this case, it will have very little application to any other criminal case because no other criminal case involves an offense under Federal law in which the elements evolve over time. The elements of this offense are now essentially identical to what has historically been considered a lesser crime, plunder. And the District Court found that punishment of life imprisonment would be grossly disproportionate to the offense of an unsuccessful attack on the high seas that caused no damage to the victims. There is no tradition of imposing life on first-time offenders for such conduct. And the international practice confirms that a sense of life would be uniquely harsh for this offense. And under these circumstances, we'd ask this court to affirm the considered judgment of the District Court. Thank you. Thank you very much, sir. We'll come down in Greek Council and then call the next case.
judges: Robert B. King, Barbara Milano Keenan, Andre M. Davis